### UNITED STATES  DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
**Urbana Division**

| | | |
|---|---|---|
| **MARY J. MOORE,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **COMMISSIONER OF SOCIAL** | ) | **Case No.   04-2254** |
| **SECURITY, suing Jo Anne Barnhart,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

In October 2003, Barbara Welsch, an administrative law judge (hereinafter "ALJ"), denied social security benefits to Plaintiff Mary Moore.  The ALJ based her decision on findings that Plaintiff was not disabled within the meaning of the Social Security Act and she was capable of performing a significant number of jobs available in the national economy.

In November 2004, Plaintiff filed a Complaint (#1) against Defendant Jo Anne Barnhart, the Commissioner of Social Security, seeking judicial review of the final decision by the Regional Commissioner of the Social Security Administration denying social security benefits. In January 2006, Plaintiff filed a Motion for Summary Judgment (#14), and in April 2006, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#18). After reviewing the administrative record and the parties' memoranda, this Court recommends **DENYING** Plaintiff's Motion for Summary Judgment **(#14)** and **GRANTING** Defendant's Motion for an Order Which Affirms the Commissioner's Decision **(#18).**

### I.  Background

### A.  Procedural Background

Plaintiff applied for social security benefits in February 2001, alleging disability beginning June 1, 1995, based on bipolar disorder, short attention and memory spans, and impulsive behavior.  The Social Security Administration had denied her two previous applications of 1999 and 2000 initially, and no further action was taken.  The Social Security Administration denied her current application initially and upon reconsideration.  She appealed, and ALJ Welsch held a hearing in May 2003.  In October 2003, the ALJ denied Plaintiff's

application for social security benefits based on findings that Plaintiff was not disabled within the meaning of the Social Security Act and she was capable of performing a significant number of jobs that exist in the national economy.  In September 2004, the Appeals Council denied Plaintiff's request for review, and Plaintiff subsequently appealed the decision to this Court.

### B.  Plaintiff's Medical Background

The following background is taken from the record.  Plaintiff was twenty-eight years old at the time of the ALJ's decision.  She had completed the tenth grade of high school and had twice failed to obtain her general education diploma (hereinafter "GED").  Plaintiff has previously been employed in numerous service jobs including order clerk, cashier, telephone solicitor, and housekeeper.  (R. 174-79.)  At the time of her application, she had not engaged in substantial gainful activity since February 2001, and had no past relevant work experience. (R. 25-26.)

In January 1999, Plaintiff moved into the Center for Women in Transition (hereinafter "CWT").  At that time, Jayne Kuntz, a registered nurse at the Champaign County Mental Health Center, evaluated Plaintiff at her own request for anxiety, panicky feelings, rapid mood shifts, and depression.  (R. 281.)  Plaintiff also reported she had been hearing voices since she was twenty.  (R. 282.)  Kuntz reported that Plaintiff appeared alert, fully oriented, pleasant, and anxious with no impairment in her daily patterns.  (R. 281-82.)  Plaintiff's Global Assessment of Functioning (hereinafter "GAF") score was 60.  (R. 287.)  Kuntz diagnosed Plaintiff with Anxiety Disorder and drug and alcohol abuse.  (R. 286.)  Kuntz suggested counseling for the anxiety disorder and referred Plaintiff to Prairie Center for treatment of her alcohol and cocaine use.  (R. 286.)

During the evaluation, Plaintiff reported a family history of mental illness and substance abuse.  Regarding her personal history of mental health treatment, she reported that she went to one counseling session several years ago and took an anxiety class at Centerpoint.  (R. 283.) Plaintiff also reported that she has a history of drug and alcohol abuse and worried that she was an addict.  (R. 283.)  The last time she used cocaine previous to the evaluation was one month

before, and she used it around three times a year.  She used marijuana the weekend before the evaluation but reported that she used it very rarely.  She further reported that before entering CWT she was drinking almost every day.  (R. 283.)

Dr. Hayng Sung Yang became Plaintiff's treating psychiatrist at the Mental Health Center.  He first saw her in June 1999.  (R. 336.)  Plaintiff reported to Dr. Yang that she had smoked marijuana and drunk alcohol from age eighteen to age twenty-three, used cocaine from age nineteen to age twenty-three, and used crack cocaine at age twenty-three.  (R. 336.)  She reported that she had been drug- and alcohol-free for about one year.  (R. 336.)

Dr. Yang described Plaintiff during the June 1999 psychiatric evaluation as somewhat childish but smiling.  (R. 337.)  He found no evidence of hallucinations or delusions and found her intelligence to be below the normal range.  Her short-term and long-term memories were intact with no cognitive impairments.  (R. 337.)  He diagnosed her with Bipolar Affective Disorder with a GAF score of 45, indicating some serious symptoms or limitations.  (R. 337.)  He also prescribed Lithobid.  (R. 337.)

At her follow-up evaluation in July 1999, Dr. Yang indicated Plaintiff had continuing problems with aggression, but she no longer heard voices.  He adjusted her medications.  (R. 335.)  In September 1999, Plaintiff told Dr. Yang she was "doing very well" with occasional periods of depression that she quickly got over, and Dr. Yang found Plaintiff to be "in a stable condition," and again adjusted her medications.  (R. 335.)

Plaintiff continued to see Dr. Yang every few months with increasing success from her medications, which he continued to adjust.  In August 2000, Dr. Yang reported Plaintiff had stopped taking her Depakote or Risperdal at bed time because she was scared she would sleep too soundly and not wake up to take care of her infant.  (R. 266.)  When she started on the medication she was doing much better, and she agreed that the Depakote was "helping her a great deal."  (R. 266.)  In September 2000, Dr. Yang reported Plaintiff was taking her medication regularly and was "less paranoid or almost not paranoid at all" and "much more friendly and

3

cooperative." She "seem[ed] to be doing quite well." (R. 265.) In November 2000, Dr. Yang reported that when Plaintiff took her medication regularly "she does fine, a whole lot better." (R. 265.)

In February 2001, Plaintiff underwent a Mental Health Assessment with Dr. Carol Baxter. (R. 332.) Plaintiff had a baby on July 29, 2000, and was the baby's primary caretaker. (R. 332.) Because of the pregnancy Dr. Yang had taken her off Lithobid, but she had no emergency room visits or psychiatric hospitalizations. (R. 333.) She reported feeling depressed and having mood swings throughout her pregnancy and worried frequently about being a new mother, which depressed her. (R. 333.) Plaintiff continued to see Dr. Yang, became involved with Healthy Families, and continued to live at CWT. (R. 333.) She had received no job training and had no future goals although she wanted to live independently and "move on." (R. 333.) Dr. Baxter diagnosed her with Bipolar Disorder I and Borderline Intellectual Functioning (IQ 77) with a GAF score of 50. (R. 332.)

In March 2001, Plaintiff told Dr. Yang that her baby was living with a foster family that was going to adopt her. (R. 383.) Plaintiff denied hearing any auditory hallucinations and was "sleeping well, eating well, rather euphoric, somehow [(*sic*)] talkative." (R. 383.)

In April 2001, at the request of Disability Determination Services, Dr. Susan Minyard performed a psychological evaluation of Plaintiff. (R. 290.) The evaluation revealed that she began hearing voices at age seventeen and had "a history of abuse of alcohol, marijuana, cocaine and crack, mostly while she was involved with her ex-husband Rick." (R. 290.) She reported that she was at one time using marijuana heavily but only used crack and cocaine once in a while. (R. 290.) The evaluation also revealed that Plaintiff was sexually abused as a child and once abused a five-year-old when she was twelve. (R. 290.) Plaintiff also reported that her ex-husband, a drug-user, had abused her. (R. 290.)

Dr. Minyard stated as follows:

[Plaintiff] appeared relatively clean but not carefully groomed . . . .

4

> She was cooperative and very pleasant and polite.
>
> . . .
>
> The claimant's speech was understandable and without slurring . . . .  She was coherent and relevant and able to sustain thought.  She answers questions but did not elaborate a great deal.  Many of her answers do appear to contain rehearsed, well-learned phrases.
>
> . . .
>
> The claimant was able to correctly recall 6 digits forward and 3 digits backward . . . .  She could recall two of three items she was given to commit to memory after a few minutes of interpolated activity.  She could recall the current President and his immediate predecessor but incorrectly identified his predecessor as "Reagan?"  She could recall her date of birth and what she had for her last meal . . . .
>
> She knew the number of months in a year, what a thermometer is and where the sun rises.  She did not know the number of weeks in a year, why dark colors are warmer than light, the capital of Italy or the main theme of the book of Genesis . . . .
>
> Mary made one error in serial sevens.  She correctly answered all five simple arithmetic questions with which she was presented.  She correctly answered one of four math story problems with which she was presented.

(R. 291-92.)  Dr. Minyard reported a GAF score of 45, which she attributed to Plaintiff's financial and housing problems, loss of child via adoption, and history of sexual abuse as a child. (R. 293.)  Dr. Minyard diagnosed Plaintiff with Bipolar Disorder, a history of substance abuse, and Borderline Intelligence.  She further opined that Plaintiff was not capable of managing her own funds.  (R. 294.)

In June 2001, Plaintiff was still living at CWT and taking medications.  Dr. Yang reported no hallucinations or delusions and described Plaintiff as "friendly and cooperative and doing quite well."  (R. 321.)  Later that summer, Dr. Yang described Plaintiff as a little euphoric but not manicy or paranoid and said she was eating and sleeping well.  (R. 321.)  Overall, he found her to be stable and well.  (R. 321.)

In June, 2001, Plaintiff underwent Intelligence Testing with Dr. William Kohen. (R. 295-96.)  He opined as follows:

5

She had an appropriate, clean appearance . . . .  She was alert, oriented, pleasant, and cooperative.  Her eye contact was good.  She was not distracted and able to focus her attention.  She easily followed the conversation, responded to all questions without delay and communicated adequately.  She spoke clearly and coherently.  Ms. Moore's thought processes were organized and lucid.  No psychotic symptoms were evident.  Ms. Moore's mood seemed within the normal range.  She initially was a little tentative and mildly anxious.  Ms. Moore expressed limited insight.  Her judgment was considered intact.  Her memory was grossly intact.

(R. 295-96.)  Dr. Kohen reported Plaintiff's IQ to be 75.  (R. 296.)  He concluded that the scores suggested that Plaintiff's general level of intellectual functioning fell in the borderline range, which likely made Plaintiff slower at performing work tasks.  (R. 296.)

In July 2001, Dr. Erika Altman, a state agency psychologist, performed a Mental Residual Functional (hereinafter "RFC") Assessment in conjunction with this case.  She diagnosed Plaintiff with Bipolar Disorder, Borderline Intellectual Functioning, and a history of drug and alcohol abuse.  (R. 350.)  Dr. Altman opined that Plaintiff was not significantly impaired in her daily life activities.  (R. 350.)  Dr. Altman described Plaintiff's mental status as unremarkable and opined that "[s]he is capable of learning, remembering and performing simple, routine tasks."  (R. 350.)  She reported mild limitations in the activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (R. 362.)  Dr. Altman concluded that Plaintiff had moderate limitations in the abilities to perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine without special supervision, accept instructions, and respond appropriately to criticism from supervisors.  (R. 362.)  In January 2002, Dr. Carl Hersmayer reviewed and confirmed Dr. Altman's findings.  (R. 362.)

In September 2001, Plaintiff was still living at CWT and had given her child up for adoption.  (R. 320.)  She denied having any hallucinations or delusions to Dr. Yang and was in a good mood with no manic symptoms.  (R. 320.)  She reported to Dr. Yang that when she closed her eyes she saw a yellow light, but he believed that this was a normal phenomenon.  (R. 320.) In December 2001, Plaintiff reported to Dr. Yang that she had a Public Aid medical card and was

applying for Social Security Disability Income.  (R. 320.)  Dr. Yang opined that she seemed to be okay and her mood seemed stable with no manic or psychotic symptoms.  (R. 320.)

In December 2001, Plaintiff underwent a psychological evaluation with Dr. Adrian Durant as part of her social security claim.  Dr. Durant opined that Plaintiff's "cooperation was good with the information obtained considered reliable and representative of current functioning."  (R. 344.)  Tests showed that Plaintiff was low average in attention, short-term memory, verbal concept formation, and logical thinking with greater limitations in mathematics.  (R. 347.)  Her responses did not indicate substance abuse at the time of the evaluation.  (R. 346.)  Dr. Durant noted that Plaintiff suffered from depression and "seemingly [tried] to come up with more favorable responses."  (R. 346.)  He indicated a need to continue treatment and supervision and noted that Plaintiff "is quite dependent and not considered capable of managing her funds without supervision."  (R. 347.)

In February 2002, Dr. Yang noted that Plaintiff had moved out of CWT and was living in her own apartment.  (R. 382.)  She was still taking her medicine regularly but did not do her Depakote blood test.  (R. 382.)  She was pleasant, friendly, and cooperative, and she denied hearing voices and did not appear to be paranoid.  (R. 382.)  In February 2002, Dr. Yang completed a Community Work and Training Program Physician Verification for Plaintiff.  He stated that she had had bipolar disorder with psychotic symptoms for more than four years, she exhibited moderate mental retardation, and she heard voices when she did not take her medication.  (R. 319.)  Dr. Yang further stated that "[d]ue to her intelligence and bipolar disorder with psychotic symptoms, it would be impossible for her to get a job."  (R. 319.)

In May 2002, Dr. Yang reported that Plaintiff was "a little bubbly, but not fully manicy" and that "she seems to be functioning quite well."  (R. 382.)  During the rest of 2002, she either cancelled or did not show up for her appointments with Dr. Yang.  (R. 381.)  In November 2002, Dr. Yang reported that he had not seen Plaintiff since May 2002, but she had told him she was taking her medication and was "[d]oing well, stable, no manic symptoms, no delusions, no hallucinations, no psychotic symptoms."  (R. 381.)  In February 2003, Dr. Yang again saw

7

Plaintiff who was the same and "[o]verall doing okay" although she told him she was lonely in her own apartment.  (R. 381.)

Dr. Yang last saw Plaintiff before the hearing in June 2003.  At this time, she was still living by herself and denied having hallucinations or delusions.  (R. 393.)  Dr. Yang noted that she was mildly euphoric but otherwise "doing well, stable, not really manicy."  (R. 393.)

### C.  Testimony at the Hearing

 At the May 2003 hearing, Plaintiff testified that she had lived by herself in an apartment complex called Homestead for a little over a year.  Her former advocate, Delores Aikens, drove her to the hearing.

Plaintiff testified she has bipolar disorder, which she describes as making her feel "really good" and then "really bad."  (R. 416.)  Plaintiff says that there is a point at which she becomes frustrated with work, which happens after about one hour of work.  When this happens she either gives up or stops working and comes back later.  When she begins a project, however, she always intends to finish it.  She also gets frustrated when people play games with her out of jealousy.  In addition to bipolar disorder, Plaintiff has panic attacks once or twice a week, which she describes as making her feel scared, like she is going to have a heart attack.  She once had to go to the emergency room because of a panic attack, but, normally, she just goes outside.  Plaintiff also hears voices for which she takes medication.  She does not hear voices when she is trying to work hard on something; mostly she hears them when she is outside smoking late at night.

Plaintiff began the eleventh grade before she dropped out of high school.  She does not remember what kinds of grades she received in junior high or high school.  Since then she has attempted unsuccessfully to get her GED.  She is thinking about going back to school sometime.

She does not have a job.  Her last job was with Wendy's almost a year ago, but it only lasted one night.  Before that she tried working at a pizza place, but it was difficult for her, and

before that she worked at Taco Bell, but she was let go because she did not keep up with the rest of the workers.  Plaintiff has also tried telemarketing but was let go because she did not make enough sales, and when she works in fast food she is too slow.  She thinks her bipolar disorder and her mild mental retardation make keeping a job difficult for her.  In the past she has been to the Department of Rehabilitation to talk about finding a job but has not been there lately.  She does not currently have any plans to get a job.

Plaintiff tried going to Work Force Preparation Center years ago while she was living at CWT.  She attended classes there and learned how to type and write an essay and also discussed various kinds of jobs.  She learned typing by herself and can type approximately twenty-one words a minute.  She received some help with writing her essay but cannot remember if she finished it.  She did not complete the program at the Work Force Preparation Center because she got upset.

When Plaintiff worked in fast food while she was living at CWT, she did not have a substance abuse problem.  She last drank alcohol the day before the hearing and has been drinking more than usual in the last month.  For a while she was drinking a little bit every day but has not been drinking as much since she cut back a week prior to the hearing.  Before cutting back she drank only beer, drinking one to four beers a day.  While Plaintiff was at CWT and when she first moved into her apartment, she did not drink at all.  The last time Plaintiff used street drugs, about four years ago, she was with her ex-husband who provided them for her when he came to see her at CWT.  While Plaintiff was with her ex-husband, she used marijuana, crack, and cocaine, but has not used any drugs for four years.

Plaintiff drinks because it seems to make her problems go away a little bit.  Her medications definitely help without any side effects other than drowsiness.  She always remembers to take her medication except when she runs out or one time when she could not remember which pill she took so she did not take another out of fear of overdosing.  The longest that she has ever gone without her medication was a week, and she felt "really bad" when she was not taking it.  (R. 408.)  The last time that she did not take her medication was a year ago

9

when she first moved into her apartment.  When she did not take it, she felt terrible and depressed.

Dr. Yang prescribes Plaintiff's medication, and she sees him once every three months.  They talk about how she is feeling and discuss her medications.  She does not currently see any other counselor and has not for some time, but next time she sees Dr. Yang she is going to request a caseworker although he has never told her that she needs to see one.  She testified she is participating in CWT's after-care, and she sees her after-care coordinator once a month during get-togethers with other former clients.

During the day, Plaintiff gets up late and likes to stay at home.  She watches TV, cooks, and walks to the grocery store.  Sometimes to get out of her apartment, she goes to the Courier Café to get coffee or visits with her neighbors.  She also goes outside to smoke cigarettes.  She smokes about one pack a day and does not think she is ready to quit yet.  Plaintiff does her own laundry and dishes.  She has never had a driver's license, and she failed her driver's test twice.  Plaintiff's hobbies include reading and being outdoors.  She likes to camp, fish, and grill but has not done so since she was with her ex-husband.  She used to go to the library a lot and get mystery books, but she cannot remember the last time she finished a book.  She has quit going lately because she has been spending more time with her neighbor with whom she watches TV, talks, cleans, and cooks.  Her friend does not have a job and is on Social Security Income.  Plaintiff does not belong to any clubs or groups and cannot remember the last time she traveled out of town or out of the state.  She uses a computer in the community room at her apartment building for short intervals to e-mail her mother, who lives in Champaign.  She also goes to chat rooms despite being told that it is not safe.

Plaintiff's apartment building is called Homestead, but she does not know who runs it.  Some people who live there work, while others rely on Social Security Income or Township assistance.  While Plaintiff lived at CWT, she helped with the cooking every day, which sometimes took two hours.  Now she cooks for herself, and her friend has taught her how to bake casseroles from a box, which she finds easy to do.  She cannot bake from scratch, so she eats

casseroles, hot dogs, and TV dinners.  Although Plaintiff says that she did not know how to bake from a box before her friend taught her, she thinks that she could have figured it out.

Dr. James Lanier, the vocational expert (hereinafter "VE"), also testified at the hearing. The ALJ asked the VE to consider an individual of Plaintiff's age, education, and past work experience who was limited to jobs that are routine and repetitive in nature without constant interaction with others and having no exertional limitations.  The VE testified that there were such jobs available, including hand packers, packagers, vehicle washers, and equipment cleaners. The ALJ then asked if there were any other cleaning jobs with light or medium exertional limitations where the individual is self-paced.  The VE testified that available jobs included janitors, cleaners, maids, and housemen.

Plaintiff's attorney asked the VE whether a person with a marked limitation in the ability to concentrate would be able to perform the aforementioned jobs to which the VE replied in the negative.  (R. 433.)  The attorney then asked the VE whether a person who had to stop once in a while to take a quick break before continuing the work would be able to do any of the jobs.  The VE testified that the cleaning jobs, such as janitor, cleaners, and maids, are still viable options because they work at their own paces.  (R. 434.)  The attorney next asked the VE whether someone who needed frequent supervision would be able to perform the jobs to which the VE replied no.  (R. 435.)

Aikens, Plaintiff's former advocate at CWT, also testified at the hearing.  Since Plaintiff moved out of CWT a year ago Aikens has only seen her at a Christmas party and Memorial Day picnic for clients who have moved out.  Aikens described Plaintiff as being shy and uncomfortable around other people.  Aikens helped Plaintiff get to the Mental Health Facility where she was diagnosed as bipolar.  Aikens testified that before Plaintiff began taking medication she was difficult to work with because she would not accept that she had a problem.

To live at the CWT, a woman has to either work or go to school thirty hours a week. Aikens testified that she helped Plaintiff look for a job but the search was unsuccessful.  Plaintiff

also tried to go to school to get her GED through Urbana Adult Education.  Finally, Plaintiff
tried to complete the Work Force Preparation Center program, but she needed a lot of attention
and asked a lot of questions.

While at CWT, Plaintiff attended a mandatory weekly support group, but she did not
always participate in the activities.  Normally, clients stay at the CWT for two years; however,
Plaintiff stayed for three years because Aikens felt Plaintiff could not handle an apartment by
herself.  Aikens then helped Plaintiff get into Homestead, which she described as a not-for-profit
organization where someone is on duty twenty-four hours a day to handle situations that arise.
Aikens testified that Homestead is not open to everyone.  She testified that Plaintiff lives
independently at Homestead, but she can call CWT when she has a problem.

### D.  The ALJ's Decision

To be entitled to social security disability benefits, a plaintiff must show that she is
unable to engage in any substantial gainful activity because of a medically determinable physical
or mental impairment that can be expected to result in death or that has lasted, or can be
expected to last, for a continuous period of at least twelve months.  42 U.S.C. § 416(I)(A).  To
determine disability, the Commissioner uses a five-step sequential evaluation.  She determines:
(1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the
claimant has a severe impairment, that is, one that significantly limits the claimant's physical or
mental ability to perform basic work activities; (3) whether the claimant has an impairment that
meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the
claimant has the RFC to perform her past relevant work; and (5) if the claimant cannot perform
the past work, whether the claimant can do other jobs that are available in the national economy.
The claimant bears the burden of production and persuasion at Steps One through Four.  Once
the claimant has satisfied the first two steps, she will automatically be found disabled if she
suffers from a listed impairment.  If the claimant does not have a listed impairment but cannot
perform her past work, the burden shifts to the Commissioner to show that the claimant is able to
engage in some other type of substantial gainful employment.  *Campbell v. Shalala,* 988 F.2d
741, 743 (7th Cir. 1993).

The ALJ's decision followed this five-step process.  At the first step, the ALJ found that Plaintiff has not been engaged in substantial gainful activity since February 20, 2001.  At the second step, the ALJ determined that Plaintiff has a combination of impairments considered "severe" within the meaning of the meaning of the Social Security Act.  At the third step, the ALJ determined that Plaintiff's condition did not meet or medically equal any of the impairments listed in Appendix I.  At step four, the ALJ determined that Plaintiff had no past relevant work.  At step five, the ALJ determined that Plaintiff had the RFC to perform routine, repetitive work without constant interaction from others and with no exertional limitations.  Based on this RFC, Plaintiff is able to perform a significant number of jobs available in the national economy across all exertional levels despite her impairments.  Finally, the ALJ stated that Plaintiff's statements regarding the degree of her symptoms and limitations were not credible to the extent alleged.  As a result, the ALJ concluded that Plaintiff was not disabled for purposes of the Social Security Act and so was not eligible for social security benefits.

## II.  Standard of Review

In reviewing an ALJ's decision, this Court does not try the case *de novo* or replace the ALJ's finding with the Court's own assessment of the evidence.  *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989).  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, are conclusive.  42 U.S.C. § 405(g).  Thus, the question before the Court is not whether Plaintiff is, in fact, disabled but whether the evidence substantially supports the ALJ's findings.  *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether Plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits.  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996).

If the Court finds that substantial evidence does not support the ALJ's decision, the Court may reverse the decision and remand for further administrative proceedings (42 U.S.C. § 405(g))

or reverse the decision and immediately award benefits if there are no unresolved factual issues and "the record can yield but one supportable conclusion." *Campbell*, 988 F.2d at 744.

The Court gives considerable deference to the ALJ's credibility determinations and will not overturn them unless the plaintiff can show that those findings are patently wrong. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989); *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992). However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

### III.  Analysis

Plaintiff argues that substantial evidence does not support the ALJ's decision for the following reasons:  (1) the ALJ mischaracterized the record and omitted portions of Plaintiff's testimony and the medical record, specifically finding that Plaintiff's mental impairments resulted from drug and alcohol abuse without any supporting evidence to form a causal connection and also relying upon a misrepresented GAF.  As a result, Plaintiff argues the ALJ improperly evaluated Plaintiff's credibility.  In addition, (2) the ALJ failed to develop the record concerning the effect of Plaintiff's mental impairments on her ability to live alone and perform substantial gainful activity.

### A.  Mischaracterization of the Record
#### i.  Connection Between Plaintiff's Mental Impairments and Drug and Alcohol Abuse

Plaintiff argues that the ALJ erred by mischaracterizing Plaintiff's testimony and medical record.  Specifically, Plaintiff contends that the record does not support the ALJ's conclusion that she has a long history of drug and alcohol abuse because she was not hospitalized or treated by her psychiatrist for drug or alcohol abuse.  In addition, Plaintiff contends that nothing in the record establishes a connection between her mental impairments and her drug and alcohol abuse; therefore, the record does not support ALJ's conclusion that Plaintiff's drug and alcohol abuse caused her mental impairments.

14

The ALJ acknowledged that Plaintiff has a long history of mental impairments, stating: "The medical evidence indicates that the claimant has bipolar disorder, borderline intellectual functioning, anxiety, a history of polysubstance abuse, alcohol abuse, and diabetes, which are severe impairments within the meaning of the regulations."  (R. 22.)  The ALJ also recognized that Plaintiff "is vulnerable to impulsive behavior, has low average attention and short term memory, has depression, [and] cannot manage her funds."  (R. 21.)

In addition, the ALJ stated that Plaintiff has "a history of using cocaine, crack, marijuana and alcohol."  (R. 20.)  However, the ALJ noted that in Dr. Durant's December 2001 evaluation, he did not report any current substance abuse, but he did mention a history of substance abuse. This is consistent with nearly all evaluations of Plaintiff.

Notwithstanding Plaintiff's argument that there is no record of substance counseling or hospitalization, the record is replete with references to Plaintiff's past drug and alcohol use.  The record shows that Plaintiff's evaluations often refer to drug and alcohol abuse.  In fact, when Plaintiff first moved into CWT in 1999, Dr. Kuntz referred her to Prairie Center for counseling regarding her alcohol and cocaine use.  Thus, the Court's review of the record supports the ALJ's statement that Plaintiff "has a long history of drug and alcohol abuse."  (R.19.)

Plaintiff next contends that the ALJ erred by finding that Plaintiff's alcohol and drug abuse caused her mental impairments.  The ALJ explained her reasoning as follows:

> The claimant's statements regarding the effect of her impairments upon her ability to work is [(*sic*)] not credible to the extent alleged.  The claimant's level of functioning especially absent substance abuse and medication compliance allows her to live independently and perform all the daily activities she chooses to perform [(*sic*)]

> The undersigned is aware that the diagnosis of polysubstance abuse has been offered at various times in the medical record, and at the hearing, [Plaintiff] stated that she continues to drink.  The undersigned finds that the limitations which are caused by the claimant's mental impairments are related to substance abuse; the claimant has few symptoms when she is abstinent and taking her medication.  Even considering the times when the claimant is engaged in substance abuse, she is able to perform work that is routine and repetitive without

15

constant interaction with others.  When she abstains, her functional abilities are
even higher.

    . . . She has moderate problems with social functioning when actively
engaged in substance abuse; she is therefore limited to jobs which do not require
constant interaction with others.  Currently even though she continues to drink,
she is able to relate well to treating sources and neighbors.  Her ability to maintain
concentration, persistence, or pace is moderately limited due primarily to
substance abuse and related mental symptoms when she drinks, uses drugs and
does not take her medication; she is therefore limited to jobs which are routine
and repetitive in nature.  There are episodes of decompensation only when she is
actively engaged in substance abuse and does not take her medications . . . .

(R. 23-24) (citation omitted).  The ALJ offered no further explanation of her reasoning regarding

the connection between substance abuse and Plaintiff's mental impairments.


Social Security Act regulations provide that the ALJ should consider "the combined

effect of all . . . impairments" when making a disability determination.  20 C.F.R. § 416.923.

However, a plaintiff "shall not be considered to be disabled . . . if alcoholism or drug addiction

would . . . be a contributing factor material to the Commissioner's determination that the

individual is disabled."  42 U.S.C. § 423(d)(2).  If it is not possible to separate a plaintiff's

mental impairment from her substance abuse, a finding of not material is appropriate.  *See*

*Jarmon v. Barnhart*, No. 02C3702, 2004 U.S. Dist. WL 742080, at *8 (N.D. Ill. Apr. 1, 2004)

(unreported) (adopting *Clark v. Apfel,* 98 F. Supp. 2d 1182, 1185 (D.C. Ore. 2000).  Thus, if the

claimant has a mental disorder apart from substance abuse the case need not be automatically

dismissed.


Plaintiff further argues that no evidence in the medical record addresses whether her

mental impairments are due to drug or alcohol abuse.  The Court agrees; although the Court finds

that Plaintiff has a history of substance abuse, it has been unable to find any evidence in the

record to support the ALJ's finding that Plaintiff's drug and alcohol abuse was material in

causing or exacerbating Plaintiff's mental impairments.  Although there may well be a

connection the record simply does not contain substantial evidence to support such a conclusion.

*Diaz*, 55 F.3d at 306.  Thus, the Court concludes that the ALJ erred when she found that

Plaintiff's substance abuse caused her mental impairments.  Nevertheless, as the Court discusses in Section B(ii) below, this error is harmless.  *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (applying harmless error review to ALJ's determination).

### ii.  GAF Scores

In addition to errors related to Plaintiff's history of drug and alcohol abuse, Plaintiff argues that the ALJ erred by using Plaintiff's highest GAF score without considering that the highest score may be an aberration.  Plaintiff also contends that her GAF scores (along with other medical evidence) demonstrate that she is disabled.

As an initial matter, the Court notes that the Social Security Administration discourages the use of GAF scores when considering whether a claimant is disabled because the scores do not have a direct correlation to the severity requirements in the listings for mental impairments. 65 Fed. Reg. at 500746-65.

Plaintiff's GAF scores ranged from forty-five to sixty.  The ALJ listed each of these scores in recounting the record.  (R. 20-21, 23)  However, the text of the decision indicates that she did not base her decision regarding disability on the GAF scores.  Thus, her references to Plaintiff's GAF scores do not constitute reversible error.

### iii.  Plaintiff's Credibility

Plaintiff next argues that the ALJ erred by concluding that Plaintiff was not credible. Specifically, she contends that the ALJ first mistakenly concluded that Plaintiff has a long history of drug and alcohol abuse and then relied on that conclusion when considering the question of credibility.

The ALJ stated that Plaintiff's "allegations regarding the degree of her limitations are not totally credible for the reasons set forth in the body of the decision."  (R. 25.)  Regarding Plaintiff's credibility, the ALJ stated in the body of her decision as follows:

The claimant has made inconsistent statements about her substance abuse. She has told treating sources that she stopped using when she was 23 but then states throughout the record that she continues to drink and use drugs. Any conclusions made by treating sources which are based on the accuracy of the claimant's statements regarding substance abuse are suspect.

. . .

The claimant's statements regarding the effect of her impairments upon her ability to work is [(*sic*)] not credible to the extent alleged. The claimant's level of functioning especially absent substance abuse and [with] medication compliance allows her to live independently and perform all the daily activities she chooses to perform.

(R. 22-23) (citations omitted).

Credibility is essentially the degree to which a plaintiff's statements about his or her impairment can be believed. SSR 96-7p. In general, the Court will defer to an ALJ's credibility determination because the ALJ has the opportunity to observe Plaintiff. *Ehrhart v. Sec'y of Health and Human Servs.,* 969 F.2d 534, 541 (7th Cir. 1992). However,

[i]t is not sufficient for the adjudicator to make a single, conclusory statement that . . . 'the allegations are (or are not) credible.' . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p.

One of the best indications of Plaintiff's credibility is the consistency of her own statements. SSR 96-7p. The record in this case is full of inconsistent statements made by Plaintiff herself, including but not limited to statements on how far she went in school, when her impairments first arose, when she started hearing voices, and also when and how much she used drugs.

Here, Plaintiff contends that her inconsistent statements are the result of bipolar disorder, short attention and memory spans, and impulsive behavior, rather than the result of drug and alcohol abuse. Regardless of what caused Plaintiff to make the inconsistent statements, clearly the fact of these inconsistent statements undermines Plaintiff's credibility.

18

The record is full of inconsistent statements made by Plaintiff that the ALJ could have relied on in making a credibility finding; therefore, the Court finds the ALJ's credibility determination was not patently wrong, is supported by substantial evidence, and is sufficiently detailed that we are able to trace the ALJ's path of reasoning.  *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## B.  Development of the Record
### i.  Homestead

In addition to her argument that the ALJ mischaracterized the record, Plaintiff argues that the ALJ failed to develop the record adequately.  She first contends that the ALJ failed to appreciate and inquire into Plaintiff's living situation.

"It is a basic obligation of the ALJ to develop a full and fair record."  *Smith v. Sec'y of Health, Educ. and Welfare,* 587 F.2d 857, 860 (7th Cir. 1978).  However, the Court will generally respect the ALJ's judgment as to how far the record must be developed.  *Luna v. Shalala,* 22 F.3d 687, 692 (7th Cir. 1994).

The evidence shows that Plaintiff told Dr. Yang she was living independently with few mental symptoms and also that "she moved out of the women's shelter and was living by herself in her own apartment and had some friends in the same building."  (R. 21.)  Dr. Yang continued to note that, while living on her own, Plaintiff was stable.  In addition, Aikens further described Plaintiff's residence as a not-for-profit home where there were services available.  Finally, Plaintiff herself testified that she was living independently.  Based on this evidence, the ALJ found that "[Plaintiff] moved out of the shelter into her own apartment and was taking her medications without symptoms."  (R. 23.)  The ALJ thus concluded that Plaintiff was living independently.

Plaintiff contends that the ALJ's conclusion that Plaintiff lives alone is a mischaracterization of the record, especially given Aikens' testimony that the residence was not-for-profit and had a staff person on hand twenty-four hours a day.  Plaintiff further contends that

her history of living at CWT, a shelter for homeless women and children that accepts women for a two-year training and rehabilitation program, and her prolonged stay there demonstrates that she could not have been living independently.  The Court acknowledges that living in the Homestead does not appear to be the same as living in one's own apartment.  On the other hand, there is no indication that Plaintiff was availing herself of the services offered by Homestead.  In light of the evidence, the ALJ had no way of knowing that Plaintiff's living situation at Homestead may not have been fully independent.

In her memorandum, Plaintiff states that "[t]he Homestead has counselors on-site who worked with [Plaintiff] to assist her in maintaining her apartment, albeit with some difficulties due to her impulsive behaviors." (Memorandum in Support of Plaintiff's Motion for Summary Judgment, #16, p. 7.)  Plaintiff does not provide a citation to the record for this argument.  The Court has throughly searched the record and found nothing to support this statement.  The record does not show that Plaintiff was consulting counselors at the Homestead; in fact, Plaintiff herself said that she was not seeing any counselor other than Dr. Yang every three months.

The Court concludes that while perhaps Plaintiff was not living entirely on her own, there is nothing in the record to demonstrate or even to suggest this.  The record and Plaintiff's own statements support the ALJ's conclusion that Plaintiff was living independently.  Thus, the ALJ did not err by reaching that conclusion.

### ii.  Ability To Perform Substantial Gainful Activity

Finally, Plaintiff argues that the ALJ failed to develop the record adequately as to the effect of her mental impairments on her ability to perform substantial gainful activity.  She contends that her mental impairments and not substance abuse prevent her from performing substantial gainful activity.  Specifically, she contends that her diagnoses of borderline intellectual functioning, bipolar disorder, and depression along with medical evidence that she is impulsive and has low average attention spans and short term memory demonstrate medically determinable reasons as to why she is disabled.  She also contends that her quick frustration when working and her past unsuccessful attempts to work show that she is disabled.

In determining whether Plaintiff is disabled, the ALJ must consider all symptoms and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. § 416.929; SSR 96-7p.  The ALJ must also consider any medical opinions that reflect judgments about the nature and severity of the impairments and resulting limitations.  20 C.F.R. § 416.927; SSR 96-2p, 6p.

The ALJ acknowledged that Plaintiff has some mental impairments, stating:  "The claimant has a bipolar disorder, borderline intellectual functioning, a history of drug abuse, alcohol abuse and diabetes, which are impairments considered 'severe' based on the requirements in the Regulations 20 C.F.R. § 416.920(b)."  (R. 25.)  However, Plaintiff is not entitled to disability benefits simply because she has mental impairments or because her psychiatrist states that she is disabled or unable to work.  *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

The ALJ then found that Plaintiff's impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  She based her decision in part of Plaintiff's history of substance abuse, stating as follows:

> The claimant's documented mental impairments have been evaluated in accordance with 20 C.F.R. § 416.920a, and the resulting degree of functional limitation rated under Section 12.04 (affective disorder bipolar), 12.06 (anxiety) and substance abuse.  The claimant has only slight restrictions in her activities of daily living as evidenced by the discussion of her daily activities including her ability to live independently and perform all the activities to support an independent lifestyle.  She has moderate problems with social functioning when actively engaged in substance abuse; she is therefore limited to jobs which do not require constant interaction with others.  Currently even though she continues to drink, she is able to relate well to treating sources and neighbors.  Her ability to maintain concentration, persistence, or pace is moderately limited due primarily to substance abuse and related mental symptoms when she drinks, uses drugs and does not take her medication; she is therefore limited to jobs which are routine and repetitive in nature.  There are episodes of decompensation only when she is actively engaged in substance abuse and does not take her medications; however, she has not demonstrated that she meets or equals the . . . criteria of the Listings . . . .

(R. 24.)

Nevertheless, the ALJ did not base her decision regarding Plaintiff's ability to perform substantial gainful activity solely on her history of substance abuse.  In part, the ALJ used Plaintiff's activities to reach a decision regarding her impairments, stating as follows:

> The claimant testified that her medications help but they cause sleepiness.  She occasionally runs out of medications; [(*sic*)] and stated that the last time was one year ago.  She sees Dr. Yang once every three months, but has not seen a counselor for some time.
> . . .
> The claimant testified she watches TV, cooks, launders clothes, does the dishes, walks to the grocery store, visits with the neighbors, takes out library books, reads mysteries, uses the computer in the community room, and e-mails her mother.
> . . .
> The claimant came to [CWT] in January 1999 and stayed for three years.  She performed household chores and cooking.  Her aftercare is coordinated and she is seen once a month at the center.
> . . .
> [T]he claimant has few symptoms when she is abstinent and taking her medication.  Even considering the times when the claimant is engaged in substance abuse, she is able to perform work that is routine and repetitive without constant interaction with others.  When she abstains, her functional abilities are even higher.

(R. 22-23.)

In addition, the ALJ specifically referred to the medical opinion of Dr. Yang, who after nearly every consultation stated that Plaintiff was taking medications and having no symptoms or that she was doing well and was stable.  Thus, the evidence shows that when Plaintiff was taking her medications, as she usually did, she exhibited no symptoms of her impairments.  Based on this and other evidence discussed in her decision, the ALJ concluded that Plaintiff could perform routine, repetitive work without constant interaction from others.  The ALJ ultimately found that Plaintiff has the RFC to perform a significant range of work across all exertional levels.  *See* 20 C.F.R. § 416.967.

Finally, the ALJ relied on the assistance of a VE during the hearing to accurately assess Plaintiff's ability to perform certain jobs.  The VE's testimony can constitute substantial

22

evidence that a plaintiff can perform a significant number of jobs.  *See Kelley*, 890 F.2d at 965 (holding that once the ALJ determines that a plaintiff can perform certain jobs, VE testimony that those jobs exist in the community requires a finding of no disability).

Here, the ALJ reasonably concluded that, while Plaintiff had severe limitations, she had not shown that she could not work at all.  This Court cannot replace the ALJ's findings with its own assessment of the evidence.  *Pugh,* 870 F.2d at 1274.  As long as reasonable minds could differ concerning whether Plaintiff is disabled, if substantial evidence supports the ALJ's decision denying benefits the Court must affirm that decision.  *Books*, 91 F.3d at 977-78. Because medical evidence, expert testimony, and Plaintiff's testimony support the ALJ's decision the Court cannot conclude that the ALJ erred when she determined that Plaintiff was not disabled and could perform substantial gainful activity.

## IV.  Summary

For the reasons set forth above the Court recommends **DENYING** Plaintiff's Motion for Summary Judgment **(#14)** and **GRANTING** Defendant's Motion for an Order Which Affirms the Commissioner's Decision **(#18)**.

The parties are advised that any objection to this recommendation must be filed in writing with the Clerk within (10) working days after service of a copy of this recommendation. *See* 28 U.S.C. 636(b)(1).  Failure to object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 8th day of June, 2006.

_____
            s/ DAVID G. BERNTHAL
            U.S. MAGISTRATE JUDGE